**BUTLER COUNTY BOARD OF COMMISSIONERS, Appellant and Cross–Appellee,**

v.

**CITY OF HAMILTON, Appellee and Cross–Appellant.**

[Cite as *Butler Cty. Bd. of Commrs. v. Hamilton* (2001), 145 Ohio App.3d 454.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

Nos. CA99–12–216 and CA99–12–229.

Decided Aug. 20, 2001.

456

458

*Arthur C. Koski* and *Michael E. Maundrell,* for appellant and cross-appellee Board of Commissioners of Butler County.

*Alan I. Robbins* and *Gary E. Becker; Mark Brandenburger,* for appellee and cross-appellant city of Hamilton, Ohio.

JAMES A. BROGAN, Judge.

This case involves a dispute between Butler County, Ohio ("the county") and the city of Hamilton, Ohio ("the city") over water rates. The county appeals from a summary judgment decision in favor of the city, and raises the following assignments of error:

"I. There are genuine issues of material fact in the record which preclude a determination of summary judgment in favor of the City of Hamilton.

"II. The trial court erred in denying Appellant's motion to supplement its motion for summary judgment."

The city has filed a single cross-assignment of error, alleging that the trial court erred by denying the city's motion for enforcement of a permanent injunction.

After considering the entire record, we find that the county's first assignment of error has merit and is sustained in part. The second assignment of error also has some merit and is sustained in part. Finally, the city's cross-assignment of error is without merit and is overruled. An explanation of our decision follows.

## I. Procedural Background

On February 9, 1998, the county filed a three-count complaint in Butler County Common Pleas Court against the city. The complaint arose from an agreement the parties entered into on April 1, 1989, governing the sale of water from the city to the county.

Counts I and II of the original complaint were for declaratory judgment of the parties' duties and obligations under the agreement. In Count I, the county

alleged that the initial contract rate was intended to be a rate that was fifty percent greater than the rate charged to similarly situated city customers. According to the county, the city had instead charged the county a rate which was about one hundred percent greater than the rate charged to city customers.

In Count II, the county stated that the city had periodically assessed increases in the initial rate from 1989 to the present. Allegedly, these increases were supposed to be based on the actual cost of service and upon the actual and proportionate flows of the county compared to the total flow at the city's treatment facilities. However, the county contended that the rate increases instead were arbitrary and discriminatory, and violated the terms and intent of the agreement. The county additionally claimed that the increases were not necessary to meet the obligations of the water system. In particular, the county listed several items that had been improperly charged to the county, including operational and maintenance expenses that did not benefit the county, costs to distribute water to city customers, and so on.

Count II of the complaint also alleged that the city had collected an excess cash surplus since 1989 of about $10,000,000, and had improperly maintained the surplus for investment purposes in violation of the agreement and the law of Ohio. The county claimed a legal and equitable interest in this fund.

In Count III, the county alleged breach of contract, asserting that the city had failed to provide water of a quality acceptable to the Ohio Environmental Protection Agency ("Ohio EPA"). The specific issues mentioned were: failure to meet the Ohio EPA residual disinfectant requirement; low buffering capacity contributing to copper pipe pinhole leak problems; and contribution to potential violation of the Ohio EPA lead and copper rule. Subsequently, the county filed a first amended complaint, changing the name of the plaintiff to the Board of Commissioners of Butler County, and asking that the court find the city in breach of the 1989 agreement.

The city then filed an answer raising affirmative defenses of *res judicata,* the statute of limitations, estoppel, waiver, and laches. In addition, the city filed a counterclaim with four claims. The first claim was for declaratory judgment, specific performance, and enforcement of a judgment entry and decree of the Butler County Common Pleas Court. The basis of this claim was a judgment issued in a 1991 bond validation proceeding, *i.e., Hamilton v. Tracy* (Dec. 4, 1991), Butler C.P. No. CV91 11 1828, unreported. The second counterclaim alleged a breach of contract by the county. Purportedly, the county had demanded rate concessions to which it was not entitled. According to the city, the controversy and uncertainty created by these demands prevented the city from being able to refinance its bonds at a more favorable interest rate.

In the third counterclaim, the city contended that the county had been improperly buying water from other sources in violation of the agreement. Finally, the fourth counterclaim requested mandamus relief, based on the county's failure to comply with a public records request regarding the county's purchase of water from the city of Cincinnati.

Shortly before summary judgment was granted, the county added Count IV to the case. This particular count contested a ten percent water rate increase that became effective after the lawsuit was filed.

Before moving for summary judgment, the city filed a motion to enforce the preliminary injunction that had been entered in *Hamilton v. Tracy*. However, this motion was denied. The city then filed a motion for summary judgment on July 14, 1999. Butler County responded to the motion on September 19, 1999, and later filed several motions, asking to supplement its summary judgment response. Ultimately, on December 2, 1999, the trial court denied the requests to supplement. On the same day, the court also granted the city's motion for summary judgment, noting that no just reason for delay existed. The county then appealed the dismissal of its amended complaint, and the city followed with a cross-appeal.

For procedural reasons, the city's cross-assignment of error will be addressed first. Specifically, if the cross-assignment of error has merit, the county could be prevented from litigating the issues in this case. In that event, the propriety of summary judgment on more substantive questions would be moot.

II. The Bond Validation Action and the City's Cross Assignment of Error

A. Factual Background

As we mentioned, the city's cross-assignment of error alleges that the trial court erred in denying the city's motion to enforce the permanent injunction entered in *Hamilton v. Tracy*. Generally, the following events led up to the bond validation action:

In 1884, the city began operating a water supply system. The county then started purchasing surplus water from the city during the 1930s. Subsequently, in 1963 and 1966, the city and county entered into two separate agreements providing for the sale of surplus water to the county. These agreements were in place for some time, but the city's surplus capacity eventually began to reach its limit. As a result, the parties recognized in the mid–1980s that city facilities would not be sufficient to meet the county's ultimate needs. Consequently, the city and county entered into an interim agreement in December 1986. Under this agreement, the county was able to purchase water at a rate of $0.845 per one hundred cubic feet while a water study was completed. The goal of the study

was to develop a "fair and equitable" rate for supplying surplus water to the county. According to the 1986 agreement, "[t]he water rate shall reasonably represent the actual cost incurred by the CITY for serving the COUNTY from its surplus water supply including the costs of renovation and enlargement of the CITY facilities."

The water study was completed in February 1987, and the results were furnished to both sides. Because the cost of service to the county was higher than expected ($2.46 per one hundred cubic feet in 1990), the parties negotiated a fixed rate of $1.05 per one hundred cubic feet. The parties also agreed that county water rates could change only when city rates changed, and by the same percentage as the "average rate" of city customers. By the time the agreement was actually signed, the contractual rate had increased to $1.14 per one hundred cubic feet, based on a nine percent across-the-board increase in water rates for city customers.

To finance construction of expansions and improvements, the city issued $59,000,000 worth of bonds. The city also filed a bond validation action in November 1991, pursuant to R.C. 133.70. The stated purpose of the bond proceeding was to obtain an adjudication of the city's authority under the Ohio Constitution and city charter to issue initial mortgage revenue bonds. Named defendants included the Ohio Tax Commissioner, the Butler County Auditor, all · city taxpayers, and all other persons affected by or interested in the issuance of the bonds.

The bond validation petition stated that the city had owned and operated a waterworks for many years. It also indicated that in 1989, the city and county had entered into an agreement for the county to buy water exclusively from the city, except in certain situations like emergencies. A copy of the 1989 agreement was attached to the petition.

Paragraph 8 of the petition then alleged:

"The Board of Commissioners, before approving and executing the County Agreement, carefully studied the water needs of the County and the possible means of meeting such needs. In the course of such study, the County, in addition to having the advice of its own qualified personnel, retained qualified independent professional engineers to advise it and carefully studied the reports of such engineers. The City also conducted a careful study and also was advised by independent professional engineers. The provisions of the County Agreement establishing the price to be paid by the County to the City for water furnished pursuant to the County Agreement and providing for the adjustment of such price, and the provisions establishing the minimum annual payment and volume purchase requirements applicable in the event the 'modification' provisions of Article VII(b) become applicable and the parties do not reach agreement in

renegotiations, are fair, just and reasonable to both the City and the County, and the County Agreement is the valid and binding obligation of each of the City and County in accordance with its terms."

The petition went on to note that rehabilitation and improvements were needed to provide for the current water system needs of the city and its inhabitants. Although a substantial part of the increase in capacity would not be required but for the sale of surplus water to the county, the city recognized that the increase in capacity was appropriate to provide for anticipated future needs of the city and its inhabitants and to attract new development.

The city also noted in the petition that it needed to issue bonds to improve and extend the system. Paragraph 11 of the petition indicated that payments by the county pursuant to the county agreement were expected to constitute a substantial portion of the revenues used to pay the bonds. The remainder of the validation petition discussed how the funds would be spent and repaid. At the end of the petition, the city asked the court for various orders, including an order in the form of a notice pursuant to R.C. 133.70(E), and an order directing the clerk to cause the notice to be published. Additionally, the city asked the court to "adjudicate and confirm the City's authority to issue the Initial Bonds and the validity and legality of said securities and all proceedings taken and proposed to be taken in connection therewith, including the Ordinance, the Indenture and the Resolution of Award and the County Agreement."

Subsequently, the county prosecutor filed an answer on behalf of the county auditor, admitting most of the allegations in the petition, including paragraphs 8 and 11. In a judgment entry dated December 4, 1991, the trial court noted that various parties, including the Ohio Attorney General and Butler County Prosecuting Attorney, had been served with notice of hearing on the petition, and did not appear. Only the city law director and city bond counsel appeared. The court then made a number of findings under Civ.R. 8(D). Essentially, the court simply repeated the contents of the validation petition. The court then issued several orders, including an order "that the provisions of the County Agreement establishing the price to be paid by the County to the City for water furnished pursuant to the County Agreement and providing for the adjustment of such price, and the provisions establishing the minimum annual payment and volume purchase requirements applicable in the event the 'modification' provisions of Article VII(b) become applicable and the parties do not reach agreement in renegotiations, are fair, just and reasonable to both the City and the County, and the County Agreement is the valid and binding obligation of each of the City and County in accordance with its terms."

Among the other orders and decrees were:

"(1) that the 'rates, fees, and other charges for the facilities and service afforded by the System established in accordance with the Rate Covenant will be in all respects fair, just, and reasonable.'

"(2) that 'the Initial Bonds * * * and all other proceedings taken and proposed to be taken in connection therewith are in all respects legal and valid * * *.'

"(3) that if no appeal were taken within thirty days, the decree 'shall be forever binding and conclusive as to all matters adjudicated, against the City, all other parties to this action, all others in privity with them, * * * and that this decree shall constitute a permanent injunction from commencing any actions or proceedings contesting the validity of the Initial Bonds, the validity of the charges authorized to be made for the payment thereof or the interest thereon, the validity of the mortgage, pledge and transfer of the Trust Estate and the grant of a franchise of the System pursuant to the Indenture and the validity of any other provision of the Initial Bonds, the Indenture, the Resolution of Award or the validity of the County Agreement, including without limitation, the provisions establishing and adjusting the price of water therein, by any person.' "

After the county filed the present action, the city filed a motion to enforce the permanent injunction. In the motion, the city asked the court to dismiss Counts I and II of the county's complaint with prejudice, due to the prior litigation. Subsequently, in a one-line entry characteristic of the decisions in this action, the trial court denied the city's motion.

## B. Legal Principles of Collateral Estoppel

The main issue in connection with the cross-assignment of error is whether the county is collaterally estopped from asserting contractual claims arising out of the 1989 agreement. In responding to this point, the county argues that its claims are not barred, due to lack of identity and issues.

Under issue preclusion, or collateral estoppel:

"[A] fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different. * * * While the merger and bar aspects of *res judicata* have the effect of precluding the relitigation of the same cause of action, the collateral estoppel aspect precludes the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action that was based on a different cause of action." *Ft. Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.* (1998), 81 Ohio St.3d 392, 395, 692 N.E.2d 140.

■ To successfully assert collateral estoppel or issue preclusion, "a party must plead and prove that '(1) the party against whom estoppel is sought was a party or in privity with a party to the prior action; (2) there was a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue; (3) the issue must have been admitted or actually tried and decided and must be necessary to the final judgment; [and] (4) the issue must have been identical to the issue involved in the prior suit.' " *State ex rel. Smith v. Smith* (1996), 110 Ohio App.3d 336, 340, 674 N.E.2d 398.

■ Significantly, the particular issue or determinative fact must have been "actually and necessarily decided in a previous decision involving a different cause of action." *Id.*

The first prong of the test involves identity of parties. To decide whether identity of parties exists, courts look beyond nominal parties to discover the real party in interest. *State ex rel. Hofstetter v. Kronk* (1969), 20 Ohio St.2d 117, 119, 49 O.O.2d 440, 254 N.E.2d 15. For example, a county is the real party in interest in actions brought against county agencies or heads of agencies. *Id.* at paragraph three of the syllabus. See, also, *Wilson v. Stark Cty. Dept. of Human Serv.* (1994), 70 Ohio St.3d 450, 453, 639 N.E.2d 105. Consequently, contrary to the county's claims, Butler County was the real party in interest in the bond validation proceeding, even though the city sued only the county auditor.

The second prong of the collateral estoppel test is also satisfied, since the county had a full and fair opportunity to litigate the bond validation proceeding, but chose not to contest anything. Unfortunately, the final two prongs are harder to assess, since case law on bond validation proceedings is very sparse.

■ However, after considering the matter fully, we do not think the bond validation proceeding necessarily had to decide that the "provisions of the County Agreement establishing the price to be paid by the County to the City for water furnished pursuant to the County Agreement * * * are fair, just and reasonable to both the City and the County." Typically, bond validation proceedings are not adversarial in nature, and the questions to be resolved are legal issues about a public entity's authority to issue the bonds and the legality of the procedures followed, *i.e.*, the court decides only if the public entity passed appropriate ordinances authorizing sale of the bonds, and so forth.

In this regard, R.C. 133.70(B)(1) provides:

 "An issuer, at any time prior to its issuance or entering into of securities, may file a complaint for validation and thereby commence an action for the purpose of obtaining an adjudication of its authority to issue or enter into and the validity of, and security for and source of payment of, the securities, and of the validity of all

proceedings taken and proposed to be taken in connection therewith, including, but not limited to, any of the following:

"(a) The levy of taxes or special assessments levied or to be levied;

"(b) The lien of those taxes or special assessments;

"(c) The levy or charge of rates, charges, rentals, lease payments, or tolls;

"(d) Any underlying public obligation;

"(e) The proceedings and remedies for the collection of the taxes, special assessments, rates, charges, rentals, lease payments, or tolls, or payments by an obligor."

The bond validation statute sets out the procedures to be followed, including the trial court's hearing and determination of all questions of law and fact. See R.C. 133.70(K). R.C. 133.70(M) then states:

"All of the following apply to a final judgment of the court of common pleas, as finally affirmed or modified in any appeal, that determines that the issuer has authority to issue the securities upon the general terms set forth in the complaint for validation and that adjudicates the legality of all proceedings taken and proposed to be taken in connection with the securities and any underlying public obligation:

"(1) The final judgment is forever binding and conclusive, as to all matters adjudicated, against the issuer, any obligor, and all other parties to the action, and those in privity with them, whether named in the action or included in the description in the notice provided for in division (E) of this section.

"(2) If all procedural steps required to be taken for the completion of the authorization, issuance, sale, and delivery of the securities, and for entering into any underlying public obligation, after the date of the final judgment, are properly taken in accordance with the applicable provisions of law and the terms of the final judgment, the final judgment constitutes a permanent injunction against any person's contesting, by any action or proceeding, any of the following:

"(a) The validity of the securities and of any underlying public obligation generally described in the complaint;

"(b) The validity of the taxes, special assessments, tolls, charges, rates, or other levies, or lease payments, or payments by an obligor, authorized, contracted, or covenanted to be imposed, made, or collected for the payment of the debt charges on the securities or of payment obligations under the public obligation;

"(c) The validity of any pledge of or lien on revenue or property to secure the payment of the debt charges or payment obligations on the securities."

As we mentioned, little case law exists in this area. In *Norton v. Limbach* (1989), 65 Ohio App.3d 709, 585 N.E.2d 444, the Ninth District considered an appeal from a bond validation order. One ground of appeal was that the trial court erred in failing to file written findings of fact and conclusions of law under Civ.R. 52. In rejecting this ground, the Ninth District noted that the bond validation statute then in effect referred to "the lawfulness and legality of the bond issue and the proceedings taken thereby." *Id.* at 718, 585 N.E.2d 444. Relying on *Middletown v. Ferguson* (1986), 25 Ohio St.3d 71, 76, 25 OBR 125, 495 N.E.2d 380, the Ninth District observed that judicial review was limited to the validity of the proceedings and the issuer's authority. *Id.* Accordingly, the Ninth District concluded that findings of fact were not required, since the trial court had encountered only issues of law. *Id.*

*Norton* may be questionable authority for two reasons. First, R.C. 133.70 was amended in 1989 (prior to *Norton*, but after the cause of action in *Norton* accrued). The amended statute specifically gives trial courts authority to decide questions of law and *fact*. R.C. 133.70(K). Therefore, the statute now does contemplate court resolution of some types of factual issues. Furthermore, *Norton* may have read the *Middletown* case too broadly. Specifically, *Middletown* dealt with the bond validation statute only in the context of deciding whether the city had standing to contest the constitutionality of an initiative ordinance passed by voters to prevent a road improvement project. The Ohio Supreme Court held that the city did have standing to bring a bond validation action. In this vein, the court noted that "R.C. 133.71(B) [the predecessor statute to R.C. 133.70] authorizes judicial review, at the behest of the city, of the validity of all proceedings taken in connection with the bonds it proposes to issue and the city's authority to do so. We therefore hold that the city has standing in this case pursuant to a special statutory grant of authority." *Id.* at 76, 25 OBR 125, 495 N.E.2d 380. This is all the Ohio Supreme Court said in *Middletown* about the statute.

On the other hand, although the current bond validation statute lets trial courts decide issues of fact, that does not mean that every validation action necessarily involves factual questions. In our opinion, the purpose of the statute, as followed in this particular case, is to verify that a public entity has authority to issue bonds and has followed proper procedures in doing so. Accordingly, the issue of the reasonableness of the water rates was not necessarily and actually determined in the 1991 bond validation proceeding. In this regard, the following comments about collateral estoppel are pertinent:

"The main legal thread which runs throughout the determination of the applicability of *res judicata,* inclusive of the adjunct principle of collateral estoppel, is the necessity of a fair opportunity to fully litigate and to be 'heard' in

the due process sense. Accordingly, an absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action. * * * Collaterally estopping a party from relitigating an issue previously decided against it violates due process where it could not be foreseen that the issue would subsequently be utilized collaterally, and where the party had little knowledge or incentive to litigate fully and vigorously in the first action due to the procedural and/or factual circumstances presented therein." *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 200–201, 2 OBR 732, 443 N.E.2d 978.

Because the county would have had no incentive to litigate the reasonableness of the rate in the bond validation action (particularly in light of the generally nonadversarial nature of such proceedings), we find that collateral estoppel does not apply.

In this regard, we are aware of the city's argument that two rate increases were already in effect before the bond validation proceeding occurred. However, at that point, the city and county had enjoyed a cooperative relationship for many years. More important, there is no evidence that the county was aware of the alleged large surpluses that were occurring in the water fund. At the time, both sides recognized a need to improve the water delivery system, and the county may not have foreseen that litigation about the agreement would be needed. Accordingly, the trial court did not err in refusing to grant the city's motion to enforce the permanent injunction. As an aside, we note that claims for breach would not have been barred in any event, to the extent that they raise something other than the fairness of the initial contractual rate.

Based on the above discussion, the city's cross-assignment of error is overruled. Since this action is not barred by collateral estoppel, we will consider the county's assignments of error.

### III. The County's First Assignment of Error

In the first assignment of error, the county says that the trial court erred in granting summary judgment because issues of fact exist. Our review of summary judgment decisions is *de novo, i.e.,* we apply the standards that the trial court used. *Long v. Tokai Bank of California* (1996), 114 Ohio App.3d 116, 119, 682 N.E.2d 1052. Under established standards, "summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." *Zivich*

*v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201. With these standards in mind, we will review the county's specific claims.

### A. Propriety of Summary Judgment on the Issue of the Initial Contractual Rate

### (Count One)

The county first argues that factual issues exist concerning whether the initial rate ($1.14 per one hundred cubic feet) reflected the parties' intent that the water rate should be based on cost of service. In response, the city contends that the county is impermissibly trying to reform the agreement. To support its position, the city relies on *Fairway Manor, Inc. v. Summit Cty. Bd. of Commrs.* (1988), 36 Ohio St.3d 85, 521 N.E.2d 818, which involved a dispute between the city of Akron and Summit County over the sale of water. In that case, Summit County claimed that a contract for the sale of water contained unreasonable and discriminatory water rates because the county paid a surcharge of one hundred five percent, while another non-city customer paid a surcharge of only ten percent. In its syllabus, the Ohio Supreme Court held:

"1. Municipally owned public utilities have no duty to sell their products, including water, to extraterritorial purchasers absent a contractual obligation.

"2. Where rates for water from a municipally owned public utility are set forth in a contract, such rates will not be struck down as discriminatory even where no factor exists which could justify the rate discrimination."

In the text of the opinion, the Supreme Court stated:

"Courts must presume that the language of a contract between competent persons accurately reflects the intentions of the parties. * * * The purpose of this presumption is to protect a right considered basic in our society: the right to freely contract. A necessary means of preserving this right is the long-standing tradition of judicial reluctance to reform or rescind a contract absent a compelling reason to do so.

"* * *

"Where water rates are set forth in a contract, the fact that the rates contained therein are higher than those charged to similarly situated customers in the same class does not constitute a basis for judicial reformation of the contract. In such cases, it will be presumed that the higher rates were arrived at through the normal give and take of contractual negotiation. The lack of any cost differential to the seller does not affect the validity of the contractual rate. Even where no factor exists which would justify a difference in the rate charged, the court must leave the parties with their bargain." *Id.* at 87–88, 521 N.E.2d 818.

Based on these comments, the city contends that we must leave the parties to their bargain. Relying on the same comments, the county argues that *Fairway Manor* establishes only a rebuttable presumption against reformation and that contracts may be reformed if compelling reasons exist. According to the county, the following "compelling factors" justify reformation in the present case: (1) the lack of normal contractual relations for the 1989 agreement, *i.e.,* both sides were represented by the same law firm; (2) mutual mistake, since county and city officials both thought they were entering into a cost of service agreement; and (3) the city's failure to give the county all results and conclusions of the cost of service agreement.

We think both sides construe *Fairway Manor* too broadly, to suit their own respective positions. If the city's interpretation is true, contracts could never be challenged on any basis. On the other hand, if the county's view is correct, contracts could be set aside whenever courts find a combination of "compelling factors." In contrast, we do not think the Ohio Supreme Court abandoned normal contract principles in *Fairway Manor.* We also do not believe that the court adopted a new theory of "rebuttable presumptions" for municipal water contracts. Basically, what the court decided is that contracts to supply water to nonresident customers will not be set aside because the rates are discriminatory. This conclusion was based primarily on two grounds. First, the court stressed that parties should live with their bargains. Second, the court found rescission unworkable, due to many unanswered questions about how courts could force the parties to come to a meeting of minds, about who would determine the appropriate water rates, and about what rates would prevail while the contract was being negotiated. *Id.* at 89–90, 521 N.E.2d 818. In this regard, the court strongly cautioned against judicial interference in these types of disputes, because intervention "creates many more problems than it solves." 36 Ohio St.3d at 90, 521 N.E.2d 818.

■ By the same token, the court did not completely foreclose any type of remedy. For example, the court commented that remand would serve no purpose, since the trial court had already found that the contract was entered into "freely and without duress." *Id.* at 88, 521 N.E.2d 818. Therefore, we must assume that traditional contract principles like duress can apply, even where a contract involves municipal water rates. Compare *Xenia v. State* (2000), 140 Ohio App.3d 65, 71, 746 N.E.2d 666 (holding that "sale of municipally owned public utility services to nonresidents is subject to review to ensure its compliance with the same statutory and common law rules that govern contracts generally"). Therefore, we will examine each "compelling factor" to see whether the 1989 agreement violated principles that generally govern contracts.

The first "compelling factor" is the conflict in legal representation. Representing parties with conflicting interests may violate ethical canons of the legal profession. See, *e.g.*, EC 5–14. However, it does not justify setting this particular contract aside, since the county knew of the potential conflict and decided to use the same law firm anyway. Parties are bound by their own voluntary choices, even if those choices prove ill-advised. We note that our decision on this point is not an endorsement of the attorneys' conduct.

The second compelling factor mentioned by the county is the parties' "mutual mistake" in agreeing to a fixed rate contract when they intended instead to enter into a "cost of service" agreement. In some situations, mutual mistake can be grounds for contact rescission. See, *e.g.*, *Reilley v. Richards* (1994), 69 Ohio St.3d 352, 353, 632 N.E.2d 507. According to the Ohio Supreme Court, "[a] mistake is material to a contract when it is 'a mistake * * * as to a basic assumption on which the contract was made [that] has a material effect on the agreed exchange of performances.'" *Id.*, citing 1 Restatement of the Law 2d, Contracts (1981) 385, Mistake, Section 152(1). One requirement, however, is that mistake must be pled with particularity. See Civ.R. 9(B). Further, if particular pleading requirements for fraud and mistake are disregarded, a party waives the right to pursue such causes of action. See, *e.g.*, *State Sav. Bank v. Gunther* (1998), 127 Ohio App.3d 338, 346, 713 N.E.2d 7.

Notably, the complaint in the present case does not allege mutual mistake, nor do its allegations even remotely lend themselves to such a construction. Instead, Count One (which is pertinent here) alleges that the initial contractual rate was intended to represent a rate that was fifty percent greater than the rate for similarly situated customers residing within the city limits. Count One further alleges that the city instead charged the county a rate one hundred percent greater than the rate given to city residents. Based on these facts, Count One requests damages for the overcharges.

By failing to raise mutual mistake in the pleadings, the county waived its right to pursue this issue. In this regard, however, some cases hold that Civ.R. 9(B) should not be strictly applied, even where pleadings are vague, as long as the defendant has notice of the matters about which the plaintiff complains. See, *e.g.*, *Aluminum Line Products Co. v. Brad Smith Roofing Co., Inc.* (1996), 109 Ohio App.3d 246, 259, 671 N.E.2d 1343. Assuming for the sake of argument that adequate notice existed, we still see no evidence of mutual mistake that materially affected the contract.

As we mentioned earlier, when the parties entered into the 1986 agreement, they intended to use "cost of service" as the basis for the new agreement. However, because the actual cost of service turned out to be more than expected

($2.46 per one hundred cubic feet), a lower initial rate was then negotiated ($1.14 per one hundred cubic feet). This was a negotiated rate, not a "cost of service" rate.

According to the county's main negotiator and representative, James Hinchberger, the county's primary concern was to assure continued water service. The county recognized that it might have to pay some type of subsidy to achieve continued service. City council member, Adolph Olivas, also testified that cost of service was discussed with the county and was rejected. Instead, the agreement contained a surcharge because the county was an out-of-city customer.

Admittedly, none of the witnesses was particularly clear about the basis for the $1.14 figure. However, the basis is irrelevant, since no one appears to have assumed that this figure represented the actual cost of supplying water to the county. In fact, the county could not have assumed that, since the information it had been given was that the actual cost of service significantly exceeded the negotiated rate. The record does reveal some confusion by various parties over how much of a surcharge the initial rate represented. However, this issue is also irrelevant, since the parties clearly abandoned the cost of service approach and adopted a negotiated initial rate. Accordingly, the concept of "mutual mistake" cannot apply to this case.

The final "compelling factor" is the city's alleged failure to disclose all results of the cost of service study. In other words, the county contends it was fraudulently induced to enter the contract. A party who is fraudulently induced to enter a contract may sue to rescind the contract. Alternatively, he or she may retain the contract and sue for damages for the tort of fraudulent inducement. *Mid–America Acceptance Co. v. Lightle* (1989), 63 Ohio App.3d 590, 599, 579 N.E.2d 721. To maintain an action to rescind, a party must prove, by clear and convincing evidence "(1) that there was actual or implied false representations of material matters of fact, (2) that such representations were false, (3) that such representations were made by one party to the other with knowledge of their falsity, (4) that they were made with intent to mislead a party to rely thereon, and (5) that such party relied on such representations with a right to rely thereon." *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph two of the syllabus.

Like mistake, fraud must be pled with particularity and the waiver doctrine would apply. Again, after reviewing the complaint, we see nothing that arguably raises fraud. Instead, the county simply says in the complaint that the contractual surcharge was intended to be fifty percent, and that the city instead charged a one hundred percent surcharge. Accordingly, we could reasonably find that the county waived the issue of fraud.

We do note that the county did not discover the facts underlying the alleged fraudulent inducement until the deposition of Steve Seitz. Seitz is an engineer and was employed by the consulting firm that prepared the 1987 water rate study used to determine the "cost of service." His deposition was taken on October 21, 1999—after the summary judgment hearing was held, but before the discovery deadline expired.

During the deposition, the county learned that Seitz had sent four rate variations (A, B, C, and D) to the city in December 1987. These variations were sent after the February 1987 rate study was published but before the water agreement was signed in 1989. Seitz told the city that rates C and D were "for your eyes only." C and D disclosed a rate for cost of service to the county that was actually less than the rate for city residents. These variations were not disclosed to the county, and the documents themselves, including the "for your eyes only" message, were never found in city files during the discovery process.

The omitted information is troubling, since a lower cost of service scenario could arguably have affected negotiations. Moreover, based on the interim agreement, one could argue that the water consultant acted in a dual capacity and that both the city and county intended to rely on the information that was disclosed. Specifically, the 1986 interim agreement provided:

"Section 1. The CITY agrees to employ a qualified consultant to prepare a study for the purpose of developing a fair and equitable water rate for supplying surplus water to the county. The water rate shall reasonably represent the actual cost incurred by the city for serving the COUNTY from its surplus water supply including the costs of renovation and enlargement of the CITY facilities. The consultant shall use, as a guide, common acceptable methods of cost allocation, such as the Base–Extra Capacity Method as presented in the American Water Works Association Manual, 'Water Rates,' AWWA No. M1 and 'Water Rates and Related Charges,' AWWA M26 latest revisions.

"* * *

"Section 5. * * * [T]he COUNTY agrees that the water rate to be charged to the COUNTY shall be $0.845 per 100 cubic feet. This water rate shall * * * remain in effect until such date that the water study described in SECTION 1 has been completed in sufficient detail that a more accurate accounting of the cost of servicing the COUNTY can be determined and agreed to by the parties by a new agreement." (Underlining *sic.*)

Unfortunately, after learning about the omitted information, the county did not ask to amend the complaint to allege fraud. Instead, the county simply raised the issue in a motion to supplement its response to the city's summary judgment motion. The trial court denied the motion to supplement (and the denial is the

subject of an assignment of error in this appeal). Again, because the county failed to properly raise the issue, we think the point was waived.

 However, even it the issue had been properly raised, rescission was not the appropriate remedy. Specifically, for a contract to be rescinded on the basis of fraud, the defrauded party must offer to return what was received. The defrauded party may then elect to have the contract set aside and to be restored to his or her original position. *Cross*, paragraph two of the syllabus.

Under the circumstances of this case, the county could not possibly "return" the water it received, and there is no way for the parties to be restored to their original positions. Consequently, the county could not have elected to rescind the contract on the basis of fraud. The county could have elected the alternate remedy of suing for damages based on the tort theory of fraudulent inducement. *Mid–America Acceptance Co.*, 63 Ohio App.3d at 599, 579 N.E.2d 721. However, the county did not ask to amend its complaint to include this theory. Accordingly, we cannot consider whether the alleged failure to disclose raises genuine issues of material fact concerning the tort of fraudulent inducement.

 The parties to this appeal have also commented on reformation, so we will discuss that matter briefly. "Reformation is the modification of an instrument to express the actual intent of the parties." *Gen. Tire, Inc. v. Mehlfeldt* (1997), 118 Ohio App.3d 109, 115, 691 N.E.2d 1132. Generally, reformation applies to cases involving mutual mistake. It does not apply to unilateral mistake. *Id.* Because we have found no evidence of mutual mistake, reformation of this type would not apply.

 Reformation has additionally been used to change agreements to reflect what would have been said, absent fraud. See *e.g., Osborne v. Osborne* (1992), 81 Ohio App.3d 666, 611 N.E.2d 1003. However, such a use would be logically inappropriate in cases like the present, where no one can possibly tell what the contract might have said, absent the alleged fraud.

As we mentioned earlier, the parties in this case contracted for a negotiated initial rate, not a cost of service rate. If the city had disclosed a lower potential cost of service, the initial rate might possibly have been lower. However, at this point, no one can say how much lower the rate might have been—or what other factors might have been taken into account. Alternatively, the parties could have decided to contract based on the actual cost of service. However, in this regard, the omitted scenarios (C and D) were only two of several "cost of service" variations that might have been considered. Again, the record does not reveal, and could not reveal, what the parties would have done in the absence of the alleged fraud. Accordingly, reformation would not apply, even if it had been properly raised.

Based on the preceding analysis, we find that the trial court did not err in awarding the city summary judgment on Count One of the complaint, *i.e.,* concerning challenges to the initial water rate.

## B. Propriety of Summary Judgment on Rate Increases

### (Counts Two and Four)

The county's second argument is that the trial court erred in awarding summary judgment on the issue of rate increases. In this regard, the county argues that the city violated the agreement by including costs in the rate increases that were excessive, arbitrary, and unreasonable. According to the county, the 1989 agreement requires a threshold determination that rate increases are necessary to meet the obligations of the city water system. Additionally, the county contends that the city acted improperly by accumulating profit, by using Water Utility Fund money to subsidize other city operations and funds, and by failing to use the formula provided in the 1989 agreement for calculating rate increases. Finally, the county claims that the city improperly included costs for capital improvements in rate increases, in violation of Article VII of the 1989 agreement.

The city makes several responses to these points. First, the city states that the agreement gives the city absolute discretion over what items are necessary to meet the obligations of the system. Further, the city contends that it did not spend water money for non-related items, as shown by the reports of independent auditors. The city also argues that it did not need to calculate the "average rate" because all categories of water usage were raised by the same percentage.

After minutely reviewing what can only be described as a very voluminous record, we agree with the county that genuine issues of material fact exist concerning Counts Two and Four. Without going into laborious detail, we found significant issues of material fact concerning the necessity of rate increases and the use of money generated by the increases.

Concerning rate increases, Article VI of the 1989 agreement provides in part:

"The water rate charged to the County shall change only when water rates charged to City customers are changed. In the event that the water rate charged to the City customers is raised or lowered, then the water rate to be charged to the County is to be raised or lowered by the same percentage as the Average Rate Charged to City Customers is raised or lowered.

"The Average Rate Charged to City Customers shall be the quotient obtained by dividing the total dollar amount of water sales to City customers by the total number of cubic feet of water supplied to City customers, both for the most recent twelve-month period for which figures are available.

"The City will notify the County at least 30 days prior to the effective date of any water rate change.

"The water rates of City Customers are subject to change from time to time when the City determines that an increase is necessary to meet the obligations of the City water system. The City and County hereby acknowledge that all future improvements to the City water system are of benefit to both the City and the County."

As we mentioned, the city argues that Article VI gives it sole discretion to decide if a rate increase is necessary. We agree that the city does have discretion under the contract to decide when to impose rate increases. Nonetheless, the city's decision is not completely beyond review. Specifically, whether an increase is necessary to meet the obligations of the system is a factual question that can be reviewed. See *Graham v. Drydock Coal Co.* (1996), 117 Ohio App.3d 297, 300, 690 N.E.2d 578.

In *Graham*, a coal company sold property, but retained the right to exercise an option to buy back acreage which was "advisable and necessary" to use and occupy for installation of a mine plant. *Id.* The company exercised an option to buy 67.92 acres, and the landowner objected. At trial, an engineer for the company testified that only fifteen acres were necessary for the mining facility. However, he also said that buying back all the acreage was advisable, to avoid red tape in the event that plans changed.

After hearing the testimony, the trial court held that the "buy back" clause was subject to being exercised at any time, based on the company's discretion, but that the issue of how much acreage was necessary was a factual question. *Id.* The trial court then ruled that the company was entitled to buy back only fifteen acres. Both sides appealed, and the court of appeals affirmed. The court of appeals agreed with the trial court that the mining company had the discretion to decide to exercise the option. However, the court also found that the trial court did not err in limiting the company's purchase of land. *Id.* at 302, 690 N.E.2d 578.

Similarly, *Plymouth v. Willard* (1988), 47 Ohio App.3d 46, 546 N.E.2d 1372, involved a water contract which provided that "[a]ny increase or decrease in rates shall be based on a demonstrable increase or decrease in the costs of performance." *Id.* at 48, 546 N.E.2d 1372. After considering evidence on whether an increase in costs was demonstrated, the trial court found that the increase was reasonable under the circumstances. *Id.* at 47–48, 546 N.E.2d 1372. The court of appeals then affirmed. In particular, the court of appeals rejected the appellant's contention that the trial court should set an appropriate rate. Instead, the court found that the trial court had appropriately determined "whether [the city's] suggested rate increase was justified under the circumstances and

therefore a 'demonstrable increase.'" *Id.* at 49, 546 N.E.2d 1372, relying on *Fairway Manor.* We agree that courts should not set appropriate rates. By the same token, courts may review the factual circumstances to see whether a contracting party has complied with the terms of the contract.

Accordingly, whether the rate increase was necessary to meet the obligations of the system was a factual issue subject to review by the court. And, as we said, material issues of fact exist on this point. In particular, we note that no one appears to have made a specific determination of necessity—or at least the city offered no concrete evidence to that effect—despite the presence of significant net earnings and surplus cash in the water fund for several years.

According to Steven Sorrell, who was the assistant City Manager from 1991 through 1998 and acting or official manager after that time, utility funds (also known as enterprise funds) exist for the benefit of customers and do not earn a profit. In fact, the city charter prohibits a utility fund from transferring its surplus to another city department or to the general fund.

During 1988 and 1989, the water system was basically in a break-even situation. However, in the years 1990 through 1995 (when rate increases were in effect), the system generated significant surpluses. For example, the system showed net earnings of $497,000 and an unencumbered cash balance of about $862,000 for 1990. In 1991, the system had net earnings of more than $2,600,000, and an unencumbered cash balance of about $1,628,000. Similarly, net income was about $1,172,000 in 1993, about $1,722,000 in 1994, and $2,118,280 in 1995.

Based on his training in municipal finance, Sorrell said that a review of the necessity for rate increases would have been a prudent exercise after the surpluses in 1990 and 1991. He assumed that a review was conducted, but did not know. The city finance director at the time also said that the net earnings in 1991 were fairly significant. She "guessed" that a reduction in rates would have been considered, but could not recall anything specific.

Again, concerning the 1992 surplus, Sorrell said he was "sure" someone would have compared the status of the fund at the end of 1992 with the upcoming rate increase to see if the increase were necessary. Sorrell believed the city's consulting firm "would" have done that. However, the city provided no information in support of summary judgment to indicate that any review was ever, in fact, conducted. These items alone raise issues of material fact about whether the rate increases were necessary to meet the obligations of the system. In addition, the affidavit of Kees Corssmit, the county's expert, states that the city included in its rates items that were not necessary to meet the obligations of the water system. While Corssmit's affidavit is somewhat conclusory, he does have a doctorate in economics. Moreover, Corssmit did also say that he had reviewed the financial records and operational data of the city's water system.

■ Based on the above analysis, we find genuine issues of material fact regarding whether the rate increases were necessary to meet the obligations of the water system. In view of this conclusion, we need not address in detail the county's remaining arguments about the diversion of funds, improper allocation of funds to capital improvements, and so on. If such conduct existed (and we did find genuine issues of fact on this point), it can be considered at trial in connection with whether the rate increases were necessary. We do note that parties to contracts are bound to each other by "standards of good faith and fair-dealing." See, *e.g., Bolling v. Clevepak Corp.* (1984), 20 Ohio App.3d 113, 121, 20 OBR 146, 484 N.E.2d 1367. Further, "[w]hen disputed, good faith efforts to satisfy contract conditions are factual issues." *Kebe v. Nutro Machinery Corp.* (1985), 30 Ohio App.3d 175, 178, 30 OBR 316, 507 N.E.2d 369.

In its brief, the city argues that the county's claims are barred by the doctrines of equitable estoppel and waiver. Essentially, the city contends that it relied on the county's representations when it financed $59,000,000 worth of improvements, *i.e.,* the county said in 1991—after two rate increases had already occurred—that the 1989 agreement was a legal and binding obligation of the county. The city also claims that the county waited too long to assert its claims.

■ However, the residual chlorine issue presents a slightly different situation. According to even the city's own information, the Ohio EPA did note instances in 1998 and 1999 when the residual chlorine content of city water failed to meet minimum standards. Although these instances may have been minimal, we cannot say that summary judgment should have been granted on this point. Our role, as well as that of the trial court, is not to weigh the evidence for or against summary judgment. Instead, our role is simply to see if genuine issues of material fact exist. Because we cannot ignore the facts in the record, we must find that summary judgment on this point was improper.

Accordingly, based on the above discussion, we find that the trial court erred in granting summary judgment on the issue of the city's alleged failure to comply with Ohio EPA requirements for residual chlorine. In all other respects, summary judgment on the claims in Count III was proper.

## IV. The County's Second Assignment of Error

■ The second assignment of error is based on the trial court's alleged error in refusing to let the county supplement its response to the city's motion for summary judgment. We review such matters for abuse of discretion. See, *e.g., Denham v. New Carlisle* (2000), 138 Ohio App.3d 439, 442, 741 N.E.2d 587.

After the summary judgment hearing was held in this case, the county filed several motions to supplement its response to summary judgment. These motions included four items: ( 1) the deposition of Steven T. Seitz, P.E., taken

October 21, 1999, including references to exhibits; (2) a 1990 rate study; (3) a "communication" file; and (4) a supplement to the previously filed affidavit of Dr. Corssmit concerning damages. We will discuss each item separately.

## A. The Seitz Deposition

As we said earlier, some new documents were discovered during the Seitz deposition. These documents revealed that the city received further rate scenarios in December 1987, and that the county was not given all the scenarios. Discovery of the documents occurred very late in the discovery process. The county says it asked the city for rate studies a year before the discovery deadline. Thus, the county blames the city for failing to supplement its discovery responses. The city's answer is that it did not have the relevant documents before the Seitz deposition. Additionally, the city claims that the county is at fault for not scheduling depositions earlier.

In view of our prior discussion of this subject, we find no error in the trial court's decision not to allow supplementation. Even if the record had been supplemented, the only potential cause of action might have been for the tort of fraudulent inducement. However, as we explained before, the county did not ask to amend the complaint to raise this issue, and it is not even arguably raised in either the original or the amended complaint. Since the omitted rate scenarios were irrelevant, considering them would not have changed the outcome. Accordingly, the assignment of error is overruled insofar as it concerns the Seitz deposition. This does not mean that Seitz cannot be called as a witness on remand, since his testimony might conceivably be pertinent to issues remaining in the case. We express no opinion on this point, other than to note that the testimony is not automatically barred by our decision.

## B. The 1990 Rate Study

The next item included in the county's motion to supplement was a July 20, 1990 rate study prepared by J.S. Sawvel & Associates for the city. Although the county timely requested discovery of rate studies, this document was also not "located" until depositions of the city consultants in October 1999. The 1990 rate study was used when the city passed the rate increases in 1990 and is relevant to whether the city breached the agreement by imposing rate increases that were necessary to meet the obligations of the system. For example, predictions used to calculate the original need for rate increases and assumptions about the expected use of revenues could be compared with the reality of what actually happened. However, any error in excluding this document is moot, given our disposition of the first assignment of error. On remand, both sides can present any relevant evidence they wish relating to the 1990 rate study.

## C. "Communication" File

 The third document encompassed by the request to supplement is page 5140 of a file marked Bates Stamp H5124 through H5166. According to the county, this document indicates that the county's cost under the agreement was intended to be a one-hundred-twenty-five percent surcharge of the city's water rate. The document was authored by a city employee in 1996, and allegedly shows the confusion of all parties about the initial rate in the 1989 agreement. The city and county disagree whether the document was disclosed in a timely fashion.

Assuming for the sake of argument that the document was not disclosed before the October 1999 depositions, we still find no error in its exclusion. As we noted earlier, the parties could not conceivably have intended the initial rate to represent the "cost of service." Therefore, any confusion about the existence or extent of a surcharge is simply irrelevant. The initial rate is not ambiguous in any way, and how the rate was derived is irrelevant to the issues the county properly raised.

## D. Expert Witness Exhibit

 The final document included in the motion to supplement is a request to file the supplemental affidavit of Dr. Corssmit, an economic expert retained by the county. According to the county, the affidavit would analyze the cost of service variations omitted in December 1987, and the 1990 Sawvel and Associates Rate Study. Additionally, the affidavit would include more detailed opinions about improper capital expenses and general fund charges. Allegedly, Dr. Corssmit would say that the city overcharged the county for water by about $9,679,000 from 1990 through 1998.

As a preliminary point, we note that the motion to supplement (Doc. 215) is missing from the record transmitted to our court. This may have resulted from the fact that five motions to supplement, all very similar in form and content, were filed during a three day period from November 16 to November 18, 1999. However, the absence of the document is not critical for our purposes, since we have been able to glean its content from the parties' briefs and from the materials which are on file. To the extent that Dr. Corssmit's affidavit relates to the 1987 variations, it was properly excluded, for the reasons already mentioned. And to the extent that the affidavit relates to the need for rate increases, any error is moot, since the county will now be able to present evidence on that point. On remand, however, the trial court should locate the missing document or order its replacement.

Accordingly, the second assignment of error is overruled in part on the merits, and is overruled in part as moot, due to the disposition of the first assignment of error.

## V. Conclusion

Based on the preceding discussion, the appeal and cross-appeal are disposed of as follows:

1. The city's cross-assignment of error is overruled.

2. The first assignment of error is sustained in part and is overruled in part. Summary judgment is affirmed as to Count One of the complaint, and reversed as to Counts Two and Four of the complaint. Summary judgment as to Count Three is affirmed in part and reversed in part. Consequently, this case is remanded for trial on Counts Two and Four, and on the part of Count III that raises the city's alleged failure to comply with Ohio EPA residual disinfectant requirements.

3. The second assignment of error is overruled on the merits as to rejection of the county's request to supplement the record with the Seitz deposition and with Bates Stamp H5125–H5166, pg. 5140. To the extent that the content of the excluded items is relevant to the issues remaining on remand, the items may be used at trial. Further, exclusion of the 1990 rate study and the supplemental Corssmit affidavit is moot, since the county will be able to use any information on remand that is pertinent to Counts Two and Four, and the remaining part of Count Three.

4. The trial court is also ordered to locate missing Docket item (No. 215) or to have it replicated, if it cannot be located.

*Judgment accordingly.*

FAIN and FREDERICK N. YOUNG, JJ., concur.

JAMES A. BROGAN, MIKE FAIN and FREDERICK N. YOUNG, JJ., of the Second Appellate District, sitting by assignment.